IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 5, 2006

## STATE OF TENNESSEE v. PHILLIP EUGENE JOHNSON

**Direct Appeal from the Circuit Court for Tipton County**
**No. 5133  Joseph H. Walker, Judge**

---

**No. W2006-00503-CCA-R3-CD  - Filed March 13, 2007**

---

The defendant, Phillip Eugene Johnson, was convicted by a Tipton County jury of statutory rape and sexual battery and was sentenced to an effective term of two years in the Tennessee Department of Correction.  On appeal, he challenges the sufficiency of the convicting evidence and argues that prosecutorial misconduct caused the jury to render an adverse verdict.  Following our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which David G. Hayes and John Everett Williams, JJ., joined.

Gary F. Antrican (on appeal), District Public Defender, and Julie K. Pillow and W. Ray Glasgow (at trial), Assistant Public Defenders, Somerville, Tennessee, for the appellant, Phillip Eugene Johnson.

Michael E. Moore, Acting Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; Elizabeth Rice, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## BACKGROUND

In July 2005, the defendant was indicted on one count of statutory rape and one count of sexual battery against the victim, A.M.[1]  At the December 7, 2005 trial, A.M. testified that she was fifteen years old and lived with her mother and step-father.  A.M. said that her best-friend was Roxanne, and Roxanne's father was the defendant.  A.M. recalled that on October 2, 2004, her parents dropped her off at Roxanne's house because they were going to the fair the next day.  In

---

[1] It is this court's policy to not disclose the names of minor victims of sex crimes.

addition to A.M. and Roxanne, Roxanne's other friend and A.M.'s two little sisters all stayed at the defendant's house that night.

A.M. remembered that she fell asleep in the living room on the sofa, but she did not recall what time she fell asleep. She said that none of the other girls were on the sofa with her. A.M. was wearing her Super Girl pajamas when she fell asleep. A.M. testified that she awoke during the night to find the defendant on top of her touching her vagina with his penis. The defendant's penis was inside her vagina. A.M. stated that she told the defendant to "get off" of her, and she fell back to sleep. A.M. recalled that she woke up two other times that night with the defendant on top of her with his penis inside her vagina. A.M. also recalled that the defendant put his fingers into her vagina after he penetrated her with his penis the first time. A.M. stated that she did not give the defendant permission to do these things to her. Each time she told the defendant to get off of her, he did not get up immediately but instead took his time. On each of the three occasions, A.M.'s pants were down to her ankles, and she was not wearing any underwear that night. A.M. did not know whether the defendant left any bodily fluids on her.

A.M. testified that she did not attempt to call anyone after what happened with the defendant because the defendant had the telephones and had told her not to tell anyone or he would hurt her. However, A.M. said that she did not believe the defendant would actually hurt her. The following day, October 3rd, the group went to the fair and then the defendant took A.M. home. A.M. said that she took a shower when she got home from the fair. A.M. told her friend what had happened at the defendant's house, and her mother found out on October 4th and took her to the hospital. A.M. was referred to a sexual assault clinic where she was examined by Nurse Copeland. A.M. noted that the defendant was not in a wheelchair on October 2, 2004.

On cross-examination, A.M. testified that she took her medicine, Seroquel, while at the defendant's house that night. A.M. said that her medicine typically made her go straight to sleep from which nobody could wake her up; however the medicine usually wore off in the middle of the night. A.M. could not recall when during the night the three incidents with the defendant occurred. A.M. admitted that she did not cry out and said that there were other people asleep upstairs when the incidents happened. A.M. said that she told Roxanne the morning after they woke up, and Roxanne told her not to wear the shirt that she had brought. A.M. testified that she also told her friend Heather on Monday at school and it was Heather who told her mother what had happened. A.M. said that she did not currently have a boyfriend, nor did she have one at the time of the incidents. A.M. testified that she was wearing her Super Girl pajamas that night, and Roxanne had not given her other pajamas to wear.

Rosa Peterson, A.M.'s mother, testified that on October 2, 2004, the defendant picked up A.M. and her two sisters and took them to his house so they could go to the fair the next day. Mrs. Peterson said that A.M. was taking Seroquel at the time and it "would knock her out real hard." Mrs. Peterson found out about what had happened at the defendant's house when A.M. had a friend tell her after school because she was too afraid. Mrs. Peterson took A.M. to Baptist East Hospital in Memphis, but she could not be treated there so Officer Richard Nessly from the Tipton County

Sheriff's Office came and took her to a rape crisis center. Mrs. Peterson gave Officer Nessly A.M.'s white and blue Super Girl pajamas that she had slept in at the defendant's house. Mrs. Peterson testified that A.M. was in special education classes in school for a learning disability, and she also had Attention Deficit Hyperactivity Disorder (ADHD). Mrs. Peterson said that she had never known the defendant to be in a wheelchair.

On cross-examination, Mrs. Peterson said that A.M. was very distant when she came home from the fair and would not talk to anyone. Mrs. Peterson stated that A.M. wore her Super Girl pajamas very often, and the pajamas were not clean when she took them to the defendant's house. Mrs. Peterson admitted that A.M. had lied before because "[e]very kid lies," but she said that A.M. would not lie about something so damaging.

Agent Lawrence James, a forensic scientist with the Tennessee Bureau of Investigation (TBI), was qualified as an expert in DNA testing and testified that he tested the evidence in this case. Agent James analyzed A.M.'s pajama pants and found several semen stains on her pants. Agent James tested one stain in particular and determined that it contained a DNA mixture, and the mixture was consistent with A.M. and the defendant's DNAs combined. Agent James noted the possibility that a third person might have been there. Agent James stated that the probability of obtaining the mixed profile of DNA from anyone other than the defendant and A.M. was 1 in 9,775,000 for the Caucasian population. The vaginal swab Agent James obtained from A.M. did not reveal the presence of semen or sperm.

On cross-examination, Agent James said that the number of sperm cells found on the pajamas was minuscule compared to the number of sperm in average male ejaculate. Agent James explained that he found stains on five different places on the pants and verified the presence of semen in three of those stains. The stain Agent James isolated for examination came from the front of the pants, right below the waistband on the left side. Agent James stated that some of the stains he found on the pants were weak. Agent James said that the pajamas were fairly dirty when he received them and did not appear to have been laundered recently.

On redirect examination, Agent James stated that it was possible to detect the presence of sperm and not be able to get a DNA profile, and he also said it was possible to detect the presence of semen without the presence of sperm. On re-cross examination, Agent James admitted that it was a possibility the weak semen stains could have been transferred from another item onto the pajamas.

Edna Kalmon with the Department of Children's Services testified that she became involved in the matter because there was another child in the defendant's home. Ms. Kalmon was present during Officer Nessly's interview with the defendant in April 2005. When the defendant was presented with the fact that a DNA test showed his DNA on A.M.'s pajamas, the defendant initially denied that anything had occurred but later said, "Then it must have happened." The defendant did not offer much detail, but later "said that he had gotten on top of her and did it." The defendant did not offer any explanation for what he meant by "did it." Ms. Kalmon stated that the defendant was

asked why he initially denied that anything had happened, and he said that he knew it was wrong and was afraid of losing his daughter.

On cross-examination, Ms. Kalmon admitted that the defendant was asked several times how his DNA got on A.M.'s pajamas before he finally said that it must have happened. Ms. Kalmon also admitted that the defendant never clarified what "it" was that he did. Ms. Kalmon recalled that the questioning lasted for about a half hour, but she was not present the entire time. Ms. Kalmon noted that the defendant acted nervous during the interview and then laid his head down on his arms when he said that he "did it." Ms. Kalmon identified pictures taken of the defendant's home and agreed that the sofa could be viewed from the upstairs.

Officer Nessly testified that he met A.M. on October 4, 2004 at Baptist Hospital and took her to the rape crisis center where she was examined by Nurse Copeland. Officer Nessly said that the next step of his investigation was to visit the defendant at his home. During that visit, the defendant denied A.M.'s allegations and provided a DNA sample. After the TBI reports on the evidence collected from A.M. and the defendant came back, Officer Nessly had the defendant come to the justice center to discuss the case. The defendant denied the allegations until Officer Nessly asked him how his DNA got on A.M.'s pajamas to which the defendant responded that "[he] got on top of her, and [he] did it." The defendant told Officer Nessly that he did not ejaculate. Officer Nessly asked the defendant why he did it, and the defendant said that he did not know, he was sorry it happened, and he was concerned he may lose his child. Ms. Kalmon accompanied Officer Nessly during both interviews with the defendant. Officer Nessly stated that the defendant was forty-five years old in October 2004.

On cross-examination, Officer Nessly denied having Ms. Kalmon present during the defendant's interviews only to scare the defendant into thinking he may lose his daughter. Officer Nessly acknowledged that the defendant did not make a written statement and said the conversation was not recorded. Officer Nessly said that he believed A.M. was telling the truth based on the way she was acting. Officer Nessly admitted that Mrs. Peterson told him at the rape crisis center that A.M. thought she might be pregnant because she had missed two periods. Officer Nessly also admitted that he only interviewed Roxanne out of the other girls that were present at the defendant's house that night. Officer Nessly recalled that Roxanne told him that all the girls stayed up late except for A.M. Officer Nessly also recalled that A.M. told him at the hospital that she did not say anything because the defendant told her not to or he would hurt her.

Nurse Rochelle Copeland with the Memphis Sexual Assault Resource Center testified that she interviewed A.M. alone during which A.M. told her that the defendant had got on top of her three times and put his penis in her "private" on each occasion. Nurse Copeland's physical examination of A.M. revealed, among other things, redness at the juncture of A.M.'s labia minor and labia majora bilaterally, as well as a circular redness at the base of her hymen. Nurse Copeland testified that there were several possible causes for the redness, including rubbing or friction in the area, poor hygiene, and infection. Nurse Copeland noted that A.M. had poor hygiene. Nurse Copeland testified that A.M.'s genitalia was as mature as a full-grown female and, as such, Nurse Copeland was able to

insert a speculum and a Foley catheter into her vagina during the examination without causing A.M. pain. Nurse Copeland surmised that it was possible for a penis to be inserted into A.M.'s vagina without causing damage to her hymen.

On cross-examination, Nurse Copeland admitted that when she conducted A.M.'s examination she was not aware that A.M. had been to the fair and rode rides. Nurse Copeland noted, however, that she did not think riding fair rides was the cause of A.M.'s redness due to the location of the genital area. When asked if more than routine bathing would be required for A.M. to wash away bodily fluids from inside her vaginal cavity, Nurse Copeland said that it depended on gravity and the time frame.

Erin Bearden, the defendant's daughter, testified for the defense. Ms. Bearden testified that the defendant had urinary problems and had to carry rags around "[f]or drippage." Ms. Bearden said that the defendant could not control the constant leakage. The defendant puts the used rags in the clothes hamper with the other dirty laundry. Ms. Bearden stated that the defendant has had the urinary condition for about six years and has also been in a wheelchair for six years, although he sometimes uses canes to move around. In looking at pictures of the defendant's house, Ms. Bearden agreed that one could see the sofa from the upstairs bedroom. On cross-examination, Ms. Bearden stated that the defendant "leaked" urine and said she knew the difference between urine, sperm, and semen. On redirect examination, Ms. Bearden said the defendant leaked semen. On re-cross examination, Ms. Bearden stated that the defendant leaked everything. When asked if it was safe to say that she did not know what came out of this penis, Ms. Bearden said, "I don't see it come out, but I know it does. I mean, I've watched it." Ms. Bearden then acknowledged that something leaked out of the defendant's penis, but she did not know what.

Dena Mashburn, a friend of Roxanne Johnson, testified that she spent the night at the defendant's house on October 2, 2004, and went to the fair the next day. Ms. Mashburn recalled that the girls "stayed up all night and baked and watched TV." Ms. Mashburn clarified that the two younger girls did not stay up all night and A.M. fell asleep on the sofa, but she and Roxanne stayed up all night. Ms. Mashburn said that A.M. did not wear her own pajamas but instead wore some of Roxanne's pajamas that were white with an animal on them. A.M. did not wear her own pajamas because they were dirty, but Ms. Mashburn did not see A.M.'s pajamas get put in a clothes hamper. Ms. Mashburn stated that A.M. was mad at the fair because the defendant "wouldn't let her go on any other ride she wanted to."

On cross-examination, Ms. Mashburn could not recall what kind of pajamas Roxanne and the other girls were wearing that night. Ms. Mashburn admitted that she was never interviewed or asked to write down details from that night. Ms. Mashburn also admitted that she could not remember the exact date they all spent the night at the defendant's house. On redirect examination, Ms. Mashburn stated that she saw Roxanne give A.M. pajamas that were white with puppy dogs. Defense counsel then inquired, "She did not wear those pajamas?" and Ms. Mashburn said "No," but not indicating to which pajamas she was referring.

Roxanne Johnson testified in rebuttal that she gave A.M. a pair of pajamas, but she did not remember whether A.M. wore the pajamas. Ms. Johnson stated that the girls stayed up late but eventually went to sleep.

Following the conclusion of the proof, the jury returned a verdict of guilty on both counts. The trial court conducted a sentencing hearing after which it sentenced the defendant to two years on each conviction. The court then merged the sexual battery conviction into the statutory rape conviction for an effective sentence of two years in the Department of Correction.

## ANALYSIS

On appeal, the defendant challenges the sufficiency of the convicting evidence and alleges that prosecutorial misconduct caused the jury to render an adverse verdict.

### Sufficiency

The defendant challenges the sufficiency of the evidence convicting him of both statutory rape and sexual battery. We begin our review with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

At the time of the offense, Tennessee Code Annotated section 39-13-506(a) defined statutory rape as the "sexual penetration of a victim by the defendant or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least four (4) years older than the victim." "'Sexual penetration' means sexual intercourse, . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal

openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7).

As pertinent to this case, sexual battery is the unlawful sexual contact with a victim by the defendant or the defendant by a victim accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent. *Id.* § 39-13-505(a)(2).

In the light most favorable to the state, the evidence at trial showed that the defendant put his penis inside A.M.'s vagina on three occasions and put his fingers in her vagina once during the course of one night. A.M. told the defendant to get off of her each time and did not consent to the defendant's actions. At the time of the offense, A.M. was fourteen years old and the defendant was forty-five years old. Nurse Copeland noted areas of redness on A.M.'s vagina during her examination. Agent James determined that a stain on A.M.'s pajama pants contained a DNA mixture from the defendant and A.M. Officer Nessly and Ms. Kalmon testified that the defendant admitted that he got on top of A.M. and "did it."

While the defendant points to testimony that the semen stains on A.M.'s pajamas were possibly caused by indirect contact, that A.M.'s vaginal redness could have been caused by poor hygiene, and that A.M. was wearing different pajamas, all the testimony was heard and assessed by the jury. The defendant tries to discredit A.M.'s testimony that the defendant woke her up on three different occasions by noting that "no one can wake her" after she takes Seroquel. However, A.M. testified that her medicine usually wore off in the middle of the night; therefore, the jury could have inferred that the rapes occurred sometime after the middle of the night. The jury also could have inferred that a fourteen year old female would wake up, regardless of what medicine she had taken, when a forty-five year old man stuck his penis and fingers into her vagina. The defendant also attempts to discredit A.M.'s testimony by pointing out that Agent James did not find semen on the vaginal swabs taken from A.M. Again, this issue was considered by the jury, and in any event, the emission of semen is not required for sexual penetration.

In sum, the direct and circumstantial evidence, when viewed in the light most favorable to the state, was sufficient for a rational trier of fact to find the defendant guilty of statutory rape and sexual battery. The defendant is not entitled to relief on this issue.

## Prosecutorial Misconduct

During the first part of the state's closing argument, the prosecutor said, "Stop him. Who will stop him?" The defendant argues that this argument was not proper because it appealed to the emotions of the jurors and implied that "the defendant was some sort of serial criminal endangering all who may cross his path."

Initially, we note that the defendant has waived this issue for failing to contemporaneously object to the prosecutor's statement, request a curative instruction, or move for a mistrial. *See* Tenn.

R. App. P. 36(a). The defendant concedes that he did not object to the statement but asserts that the prosecutor's statement rises to plain error. The defendant, however, failed to provide citation to any supporting authority as to why "this matter should not be considered waived."

Waiver notwithstanding, we have examined the issue and if we were to address it on the merits, we would conclude that no reversible error is present. In determining whether a statement made by the prosecutor constitutes reversible error, it is necessary to determine whether the statement was improper and, if so, whether the impropriety affected the verdict. *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978); *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). In making this determination, we are guided by such factors as the conduct complained of viewed in context and in light of the facts and circumstances of the case; the curative measures, if any, undertaken by the trial court or prosecution; the intent of the prosecutor in making the statement; the strength or weakness of the evidence; and the cumulative effect of the conduct and any other errors in the record. *See Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

Assuming arguendo that the prosecutor's statement was improper, we are unable to conclude that the impropriety affected the verdict. The intent of the prosecutor in making the statement is hard to discern; it could have been made to inflame the jury or instead to relate the seriousness of the offense. However, the proof presented against the defendant was strong, consisting of the victim's testimony, forensic evidence, and a confession. While no curative measures per se where taken in response to the statement because the defendant did not object, the state followed up its initial closing argument by reiterating to the jury in its rebuttal that closing argument was not part of the proof in the case. The cumulative effect of the errors in the record is none in that the defendant has not even alleged that any other errors occurred during trial. Accordingly, we conclude that the issue is waived, and even if not waived, no reversible error was committed.

## CONCLUSION

Based on the aforementioned reasoning and authorities, we affirm the judgments of the Tipton County Circuit Court.

_____
J.C. McLIN, JUDGE